IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DALE SPIESS,       )
                    )
          Plaintiff,       )
                    )
v.                      )       **Case No. 04-2458**
                    )
HOWARD FRICKE, DAN ETZEL,       )
AND DUANE GOOSSEN,       )
                    )
          Defendants.       )
_____ )

## MEMORANDUM AND ORDER

Dale Spiess brings suit under 42 U.S.C. § 1983 against Howard Fricke, former Secretary of Administration for the State of Kansas; Dan Etzel, Fiscal Manager for the Division of Facilities Management; and Duane Goossen, Secretary of Administration for the State of Kansas.  Plaintiff seeks damages from Fricke and Etzel in their personal capacities and injunctive relief from Goossen in his official capacity.  Specifically, plaintiff claims that  (1) Fricke terminated his employment in retaliation for his exercise of First Amendment rights to free speech; (2) Etzel failed to rehire him in retaliation for his exercise of First Amendment rights to free speech; and (3) Goossen should be required to reinstate him as Director of the Central Motor Pool.  See Pretrial Order (Doc. #45) at 9, entered on May 9, 2005.  This matter comes before the Court on Defendants' Motion For Summary Judgment (Doc. #46) filed May 13, 2005, and Plaintiff's Motion For Leave To File A Surreply In Opposition To Defendants' Motion For Summary Judgment (Doc. #54) filed July 25, 2004.  For the reasons stated below, defendants' motion is sustained in part and overruled in part.  Plaintiff's motion is

sustained.

## Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538–39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250–51.  "In a response to a motion for summary judgment, a party cannot

rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

### Factual Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

On January 21, 2000, the Kansas Department of Administration ("Department") hired plaintiff as Director of the Central Motor Pool ("CMP") or Motor Pool Manager, an unclassified at-will position. From January of 2002 until his termination on May 7, 2004, plaintiff reported to Joe Fritton, Deputy Director of Facilities Management, who reported to Keith Meyers, Director of Facilities Management. Meyers reported to Carol Foreman, Deputy Director of Administration, who served under Fricke, the Secretary of Administration from January of 2003 to August of 2004. Goossen replaced Fricke in August of 2004. Etzel, who reported to Meyers along with Fritton, was Fiscal Manager for DFM from January of 2001 to January of 2005.

After her election in November of 2002, Governor Kathleen Sebelius organized a "BEST" team of volunteers to evaluate government activities and find opportunities for greater efficiency. Within the DFM, the BEST team targeted the CMP — which managed vehicles that were permanently assigned, dispatched or rented to state agencies — as an area for change. On November 13, 2003, the Administration announced that it was disbanding the CMP dispatch-rental operation and reducing CMP duties to information tracking, tagging

and registration, refueling, maintenance and repair and Van Pool operations.[1]  The Administration estimated that the change in CMP functions, along with the sale of dispatch vehicles and a moratorium on vehicle purchases, would save roughly $8.6 million.[2]  As a result of the reorganization, the Department laid off a number of employees.  In early 2004, however, Fricke told Department employees that the major reorganization was complete and that the Department planned no more layoffs or department eliminations.

Plaintiff disagreed with the reorganization and questioned its future cost and true savings.  He voiced his concerns to Fricke, Etzel, Meyers, Fritton and State Senator Dave Kerr, who was a member of the Kansas Legislative Post Audit Committee ("Post Audit Committee").  Plaintiff told Fricke that the reorganization would cost the State "tens and tens of thousands in additional dollars."  Plaintiff's depo., p. 192, 6–8.  Plaintiff also disagreed with Fricke on what costs the Administration used in calculating the "Motor Pool rate."[3]

Plaintiff complained to Etzel about a similar issue involving the Van Pool.  Plaintiff objected that parking and some administrative expenses should be disregarded in determining whether the Van Pool was self-supporting.  Plaintiff also believed that Van Pool depreciation funds, which the CMP used for capital upkeep on the vans, belonged to the fee-paying passengers and not the State.  He felt that Van Pool funds were

---

[1]     In 1980, to promote fuel conservation, reduce air pollution and minimize traffic and parking congestion, the Kansas Legislature required the Department to establish a Van Pool program to transport state employees to and from work.  Participating state employees paid a fee for Van Pool transportation.

[2]     Although the Department receives some general state funds, it is largely fee-driven.

[3]     The "Motor Pool rate" refers to the fee which the CMP charged State agencies to use Motor Pool vehicles.  Plaintiff and Fricke disagreed on what costs the rate should include and what costs the CMP should pay from general State funds.  Fricke asserted that CMP operating costs had been understated because they did not include the cost of the vehicles, which the State purchased from general funds.  Plaintiff maintained that CMP costs were not understated because the CMP did not bear the cost of vehicle procurement and the Motor Pool rate accounted for all operating costs.

4

essentially owned by Van Pool passengers, and he therefore complained to Etzel about the possibility that Van Pool funds could be transferred to the State general fund.  The Department took a different view, *i.e.* that the State had purchased the vans and the Van Pool was merely reimbursing the State for vans in use at that time.

In late 2003, Fritton (plaintiff's supervisor) and Caleb Asher (the Department Public Information Officer) anticipated an inquiry by the Post Audit Committee.  They instructed plaintiff to refer all requests for information to the Secretary's office.  Plaintiff disagreed with this instruction because he felt that he had a right to provide information without Department approval.  On November 20, 2003, the Post Audit Committee instructed its audit agency, the Legislative Division of Post Audit ("Post Audit"), to determine whether the Department had considered all significant and relevant cost savings in changing the CMP functions.  On November 26, 2003, plaintiff sent Fritton an email which indicated his intent to give Post Audit all requested information without Department approval.  Fritton responded that pursuant to Department procedure, plaintiff should refer all inquiries to the Public Information Officer.  Fritton stated that plaintiff could freely express concerns as a private individual, but he also told plaintiff "you know you probably signed your death warrant with this division."[4]  Spiess depo. at p. 111.  At some point, Fritton also told plaintiff that he needed to be more of a "team member" in implementing the reorganization.  Fritton depo., at 93, 1.1–11.

Six weeks later, on January 7, 2004, plaintiff received a voice-mail message from a staff member in Fricke's office, instructing him to provide all information which Post Audit requested.  The instruction did not indicate whether Fricke knew of plaintiff's email exchange with Fritton.[5]

---

[4]     Fritton's statement occurred sometime after the email of November 26, 2003 but before January 7, 2004.

[5]     Plaintiff claims that because Fricke's office instructed him to cooperate with Post Audit, Fricke himself must have known that plaintiff later assisted Post Audit.  The voice-mail message, however,

In January of 2004, the CMP began operating in its reduced role, which included maintenance and repair services. Meyers expected to have at least seven CMP employees working in the maintenance garage. On February 4, 2004, Meyers directed Fritton and Etzel to prepare a detailed list of continuing CMP functions. The list, which Meyers approved, included information tracking, operations and contract administration. On February 8, 2004, Meyers approved Etzel's recommendation that plaintiff and Sherry Rentfro, a classified civil servant employed as a Management Systems Analyst I, begin planning to implement the continuing CMP functions.

On February 9, 2004, Post Audit released its report, which contained information supplied by plaintiff and referred to him as its source.[6] Department officials then met to discuss their response. Although Etzel was aware of plaintiff's cooperation with Post Audit, he did not discuss the matter at the meeting. None of the meeting participants (including Fricke and Etzel) referred to plaintiff or other CMP staff. Upon reviewing the report, however, Fricke had notice that plaintiff had provided information to Post Audit.

The Post Audit report detailed differences between its calculations and those of the Department.[7] The report took issue with Department calculations because (1) the Department did not bear the cost of capital for vehicle procurement and (2) rental rates had historically included overhead, liability insurance, operating costs and recovery of capital. The Post Audit report showed that Van Pool revenues had exceeded expenses by

---

was more than a month after plaintiff's email to Fritton. Also, the message stated that it was on behalf of Carol Foreman.

[6]     The Post Audit report stated that "[t]he manager told us he spent an estimated .5 hours per month, compared with the Department's estimate of 5%." Plaintiff's depo. exhibit 22, at p. 9.

[7]     In preparing its calculations, the Department used the numbers to which plaintiff had objected.

$10,000 for the previous three years, whereas Department calculations showed a $40,000 deficit for the same period. The Post Audit report explained that in the past, Van Pool rates had not included all costs of the program (such as parking and administration), and that Department figures had retroactively included as operating costs $17.50 per month per van for parking in State lots, 20 per cent of the Van Pool Coordinator's salary and five per cent of the Motor Pool Manager's salary. Post Audit expressed concern with retroactive application of these costs and suggested that consistent with Department practice, such changes only apply going forward.

Post Audit ultimately concluded that the costs or savings from the CMP reorganization could not be determined. Furthermore, it found that the Department could have maintained a self-supporting Van Pool by adjusting the fees to Van Pool participants, to cover any reasonable changes in cost calculations.[8] Plaintiff believed that the Post Audit report essentially vindicated his position.

In late February of 2004, after the Post Audit report, Etzel and plaintiff engaged in at least two heated discussions concerning falsified numbers provided to Post Audit. Plaintiff specifically complained about the

---

[8]     Post Audit concluded its report as follows:

> The budgetary savings figures reported with the recent changes in the State's vehicle fleet represent the amount of moneys that will be freed up for other General Fund expenditures this year and next. Department of Administration officials didn't try to determine all the costs or cost savings resulting from these changes. Because the size and use of that fleet is in flux, the financial impact of this decision may not be known until well after the fact, or may never be fully known. Finally, if the Department had wanted to maintain the Van Pool Program on a self-supporting basis, it could have adjusted the fees charged to Van Pool participants to cover any reasonable new charges it wanted to allocate to the Program.

Appendix To Plaintiff's Memorandum In Opposition To Motion For Summary Judgment, (Doc. #52), Exhibit 22.

costs of Van Pool parking and administration, which historically had not been represented in Department cost calculations.

Meanwhile, Meyers began evaluating garage cash flow for a 60-day period. CMP statistics showed the number of appointments and the number of hours worked for each mechanic. Without substantial utilization, the maintenance services could be discontinued and each CMP employee who was associated with the garage function was therefore at risk.[9]

In March of 2004, CMP maintenance and repair business continued to decline, and the garage was projected to lose more than $90,000 in fiscal year 2005. On March 18, 2004, in a memorandum to Foreman (Deputy Director of Administration), Meyers proposed eliminating the maintenance and repair function, terminating plaintiff's unclassified employment and laying off two classified employees. Meyers envisioned two ongoing CMP positions: a Management Systems Analyst I (Rentfro) and a Senior Administrative Assistant (Sherri Scott) who would be moved to Etzel's supervision to carry out ongoing responsibilities in vehicle information tracking, tagging, insurance, fuel and contracts.

Fricke approved Meyers' proposal on March 18, 2004. Five days later, on March 23, 2004, Meyers notified plaintiff that his employment would terminate effective May 7, 2004. Three days later, on March 26, 2004, Rentfro resigned her position effective April 9, 2004.[10]

Meyers was responsible for hiring Rentfro's replacement, and plaintiff expressed to both Meyers and

---

[9]     When the statistics showed declining use, the CMP distributed flyers to remind agencies of its maintenance garage function. Plaintiff himself reassigned two CMP employees because he could not keep them busy after the reorganization.

[10]     Sherry Scott never assumed her clerical support position under Etzel. She continued as a Senior Administrative Assistant, but transferred to the Surplus Property Division.

Etzel his interest in her position.  Plaintiff never followed up with Meyers, Etzel or Fritton, but he checked the State web site and watched for job postings.  Plaintiff believed that because Etzel would directly supervise Rentfro, he was the proper contact.  Contrary to plaintiff's belief, however, Etzel did not have any hiring authority for Rentfro's job.  The Department never posted her position, and plaintiff never asked other Department personnel about the position.

On June 15, 2004, Meyers assigned Rentfro's duties to Dennis Buelt, a classified employee whose previous duties as Safety Coordinator had been eliminated.  Buelt did not have specific experience with vehicles, but he had performed outside contract administration, information tracking and customer billing.[11]

In mid-April of 2004, the Secretary's office informed Meyers that except for five additional maintenance staff positions, which had been preliminarily approved, he could not fill any DFM positions until he completed a staff reduction at the Department's central office.[12]

On September 16, 2004, plaintiff filed suit, claiming that (1) Fricke terminated his employment because he exercised his First Amendment right to free speech by criticizing the CMP reorganization; (2) Etzel failed to rehire him because he exercised his First Amendment right to free speech on the same matter; and (3) Goossen should be required to reinstate his employment with the State of Kansas.  Pretrial Order (Doc. #45) at 9.  Defendants seek summary judgment on all counts.  See generally Defendants' Motion For Summary

---

[11]     Since assuming his role in the CMP, Buelt has not received a written performance review. Buelt had his last written performance review on September 15, 2003, which covered the period from April 18, 2002 to April 8, 2003.

[12]     Plaintiff asserts that because the Secretary preliminarily approved five additional maintenance positions, no reasonable jury could find that the Department had placed Meyers under a hiring freeze for facilities operation.  Plaintiff, however, fails to controvert Meyers' deposition testimony that the Secretary's office "made the exception to allow [him] to fill five positions."  Meyers depo, p. 169, 19–25, p. 170, 1–10.  Plaintiff does not allege that he expressed interest in one of the maintenance positions.

Judgment (Doc. #46).  Defendants specifically argue that (1) plaintiff has not set forth a prima facie case of First

Amendment retaliation; (2) defendants would have made the same employment decisions even absent plaintiff's

protected speech; (3) defendants are entitled to qualified immunity for their discretionary activity during the

reorganization period; and (4) Eleventh Amendment immunity bars plaintiff's request for injunctive relief against

Goossen.  Id.

**Analysis**

I.    **First Amendment Retaliation as to Fricke**

    Plaintiff claims that Fricke terminated his employment because he criticized the CMP reorganization,

the accuracy of calculations submitted to Post Audit, and the administration of the Van Pool program.

    When a government employer allegedly takes adverse action because of an employee's exercise of his

right to free speech, the Court applies the Pickering/Connick test to determine whether the plaintiff has

established a prima facie case of retaliation.  Getz v. Bd. of County Comm'rs, 194 F. Supp. 2d 1154, 1164

(D. Kan. 2002) (citing Kent v. Martin, 252 F.3d 1141, 1143 (10th Cir. 2001) (citing Pickering v. Bd. of

Educ., 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983))).  As applied to this action, the

first three parts of this four-part test examine the following issues:

    1.    Does plaintiff's speech on CMP reorganization and elimination of the Van Pool involve
             a matter of public concern?

    2.    If so, does plaintiff's interest in expression outweigh Fricke's interest in regulating the
             speech of its employees so that it can carry on an efficient and effective workplace?

    3.    Was plaintiff's speech a substantial factor driving his termination?

See id. (quotations and citations omitted).  If plaintiff makes these three required showings, Fricke then has an

opportunity to show that he would have terminated plaintiff's employment even in the absence of his protected

10

speech.  Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1271 (10th Cir. 1998).  The first two issues are questions of law for the Court.  The final two are questions of fact.  See id. (citations omitted).  Fricke asserts that he is entitled to summary judgment because plaintiff cannot establish any of the four Pickering/Connick factors.

### A.     Nature Of Plaintiff's Speech

The Court first examines whether plaintiff's speech touches a matter of public concern.  In determining this issue, the Court asks whether plaintiff's speech can be fairly considered to relate to any matter of political, social or other concern to the community.  Hardeman v. City of Albuquerque, 377 F.3d 1106, 1113–14 (10th Cir. 2004) (quoting Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1286 (10th Cir. 2003)).  The Court must consider the content, form and context of a given statement, as revealed by the whole record.  Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996).  Not all matters which transpire within a government office are matters of public concern.  Craven v. Univ. of Colo. Hosp. Auth., 260 F.3d 1218, 1227 (10th Cir. 2001) (First Amendment does not require that public office be run as roundtable for employee complaints over internal office affairs).

To determine whether plaintiff's speech addresses personal grievances or a broader public purpose, courts focus on the speaker's motive.  Gardetto, 100 F.3d at 812 (citing Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988)).  Speech aimed at exposing improper operations or questioning the integrity of government officials clearly concerns public interests.[13]  Conaway, 853 F.2d at 796.  In contrast, speech

---

[13]       When deciding whether speech qualifies as a matter of public concern, "courts customarily focus on whether speech was 'calculated to disclose wrongdoing or inefficiency or other

(continued...)

malfeasance on the part of governmental officials in the conduct of their official duties.'"  Patrick v. Miller,

regarding "internal personnel disputes" ordinarily will not involve a public concern.  Id. (citing Connick, 461

U.S. at 146).  Similarly, criticisms of internal management decisions, and complaints addressing the structure

of purely internal administrative bodies, do not reflect public concerns.  Gardetto, 100 F.3d at 813–14 (details

of internal budgetary allocations not matters of public concern).

Plaintiff alleges that his speech disclosed "wrongdoing, or inefficiency, or other malfeasance on the part

of government officials in the conduct of their official duties."  Plaintiff's Response To Defendants' Motion For

Summary Judgment (Doc. #51) at 19.  Fricke argues that he is entitled to summary judgment because plaintiff's

speech was not well informed and his concerns touched internal management decisions in which the public had

little interest.[14]  Fricke's arguments are without merit.

---

953 F.2d 1240, 1248 (10th Cir. 1992) (quoting Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir. 1988)).

[14]    Fricke cites Pickering, 391 U.S. at 569–70, for the proposition that plaintiff's speech was not a matter of public concern because his position was unfounded or uninformed.  In Pickering, a teacher made erroneous statements while speaking out on whether a school district needed additional funding.  The Court emphasized the need for "free and open debate" on such a matter of public concern.  Id. at 571–72.  Because teachers are "most likely to have informed and definite opinions" on public school funding issues, the Supreme Court found it essential that they be free to speak to such issues without fear of retaliation.  Id. at 572.

The teacher in Pickering erroneously reported amounts which the school district spent on athletics — a matter of public record on which he was not more qualified than other taxpayers to speak.  The school board could have easily rebutted the teacher's errors by publicly disseminating accurate figures.  The teacher did not make a careless false statement which impacted day-to-day school operations, however, and because the teacher did not have greater access to the real facts, any harmful public impact would not be difficult to counter.  The Supreme Court therefore declined to require the teacher to "make substantial efforts to verify the accuracy of his charges before publishing them."  Id.

As Motor Pool Manager, plaintiff's position is analogous to that of the teacher in Pickering.  Plaintiff was not required to provide substantial, specific citations to facts which verified his statements.  See Getz, 194 F. Supp. 2d at 1164–65 (rejecting argument that plaintiff's speech did not

(continued...)

sufficiently inform issue).  Furthermore, the fact that his position may have been unfounded does not entitle Fricke to summary judgment.

Plaintiff's speech can fairly be considered to allege improper action or inefficiency by government officials. The public interest in the integrity of a public official is firmly established. See McFall v. Bednar, 407 F.3d 1081, 1089 (10th Cir. 2005) (speech seeking to expose improper government operations, or questioning official integrity, touches "vital public interest"). On this record, plaintiff's speech could be viewed as touching political, social or other community issues under Pickering/Connick.

### B.    Weighing Of Interests

Fricke argues that he is entitled to summary judgment because his interest in maintaining an effective and efficient workplace outweighed plaintiff's interest in free speech.[15] See Getz, 194 F. Supp. 2d at 1165–66. Plaintiff responds that his interests outweigh those of Fricke because his motives are in dispute and he was acting as a whistle-blower. See Prager v. LaFaver, 180 F.3d 1185, 1191 (10th Cir. 1999) (when balancing rights of employee against those of employer, employee's First Amendment interest entitled to greater weight where he is acting as whistle blower in exposing government corruption).

Under the balancing test, the Court considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987); see also Getz, 194 F. Supp. 2d at 1166 (citing Rankin's list of considerations for balancing interests). The State has a strong interest in avoiding interferences with work, personnel relationships or the speaker's job

---

[15]    In this regard, Fricke asserts that his interest in cost-effectiveness outweighed plaintiff's interest in speech about CMP and Van Pool cost calculations. These arguments do not implicate the performance, discipline or harmony of plaintiff's workplace. For this reason, the Court declines to consider them.

performance, all of which may detract from the public employer's function.  Rankin, 483 U.S. at 388.

In this case, the evidence does not show that plaintiff's speech interfered with the efficient functioning of the Department, the DFM or the CMP.  Therefore, the Court cannot agree that as a matter of law, plaintiff's speech was so disruptive as to tip the balance in favor of Fricke.  Fricke has not conclusively shown that his interest in workplace management outweighed plaintiff's interest in free speech.

### C.     Substantial Factor Analysis

Fricke next asserts that as a matter of law, plaintiff cannot show that his speech was a substantial or motivating factor in his termination.  See Getz, 194 F. Supp. 2d at 1166 (citing Beach v. City of Olathe, Kan., 185 F. Supp. 2d 1229 (D. Kan. 2002) (internal citations omitted)).  To withstand summary judgment on the motivation factor, "an employee must produce evidence linking the employer's action to the employee's speech."  See Ramirez v. Okla. Dept. of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994), overruled in part on other grounds, Ellis v. Univ. of Kansas Med. Ctr., 163 F.3d 1186, 1194–98 (10th Cir. 1999).  Speculation, rumor and innuendo are insufficient.  See Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003).  Motive often can only be shown circumstantially, because the ultimate fact of retaliation turns on defendants' state of mind, which is particularly difficult to establish by direct evidence.  Id. (quoting Smith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990)).

Temporal proximity between the protected speech and adverse employment action may suggest a retaliatory motive; standing alone, however, it will not conclusively establish such motive.  Baca v. Sklar, 398 F.3d 1210, 1222 (10th Cir. 2005) (citing Marx v. Schnuck Mkts., 76 F.3d 324, 329 (10th Cir. 1996), and Butler v. City of Prairie Village, 172 F.3d 736, 746 (10th Cir. 1999)).  Closeness in time is sufficient, however, when coupled with the employer's knowledge of protected activity.  Ramirez, 41 F.3d

14

at 596 (internal citations omitted) (period of almost two months and knowledge of protected activity

sufficient to withstand summary judgment); compare Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th

Cir. 1997) ( Fair Labor Standards Act retaliation case, three month period alone insufficient to avoid

summary judgment).  Without temporal proximity, plaintiff must rely on additional evidence to establish

causation.  Connor v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997).  Such additional

evidence may include the employer's opposition to the protected speech, see Alpha Energy Savers, Inc. v.

Hansen, 381 F.3d 917, 929 (9th Cir. 2004), or a link between the employer and serious misconduct or

wrongdoing.  See Baca, 398 F.3d at 1221.

Fricke specifically argues that he is entitled to summary judgment because (1) plaintiff has no direct

evidence that Fricke knew of his speech and (2) plaintiff's termination did not occur until three months after

his last protected speech.  To show retaliatory motive, plaintiff responds with three pieces of circumstantial

evidence: (1) the temporal proximity between his speech and his termination, (2) inconsistent or

contradictory statements by Fricke, and (3) the unworthiness of Fricke's explanation.  See Plaintiff's

Memorandum in Opposition to Motion for Summary Judgment (Doc. #51).

The record reveals that shortly after November 13, 2003, when the Sebelius Administration

announced changes to the CMP, plaintiff told Fricke that the reorganization would cost the State thousands

of dollars and that calculations which Fricke had used to justify the reorganization were not accurate.  On

February 9, 2004, Post Audit released a report which took issue with Department calculations and

specifically referred to differences between the CMP manager and the Department with regard to Van Pool

expenses and administration.  Fricke knew that plaintiff was in charge of the CMP, and a jury could

reasonably infer that he knew from the report that plaintiff had provided information to Post Audit.

Approximately one and a half months after Post Audit released its report, Meyers terminated plaintiff's employment.

Viewing this circumstantial evidence in the light most favorable to plaintiff, a reasonable jury could find that Fricke knew of plaintiff's protected speech and decided to terminate plaintiff's employment soon after he learned of it. See Ramirez, 41 F.3d at 595–96 (circumstantial evidence and one and a half month time gap sufficient to reasonably infer retaliatory motive). The Court therefore overrules Fricke's motion for summary judgment on this issue.

### D.    Same Action Analysis

Fricke asserts that even absent plaintiff's protected speech, he would have terminated plaintiff's employment because of the poor fiscal projections and underutilization of the CMP maintenance garage. If plaintiff discharges his burden on the first three Pickering/Connick factors, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996) (citing Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); see also Ballard v. Muskogee Reg'l Med. Ctr., 238 F.3d 1250, 1253 (10th Cir. 2001) ("anyway" defense is complete bar to liability). Defendant must make this showing by a preponderance of the evidence. Baca, 398 F.3d at 1222.

To withstand Fricke's motion for summary judgment, plaintiff refers the Court to his arguments under the "substantial factor" analysis, supra Part I.C., and states that the burden is on Fricke to establish his "same decision" defense.

On the record, Fricke has not conclusively demonstrated that he would have terminated plaintiff's employment without reference to his protected speech. See Snyder v. City of Topeka, 884 F. Supp.

16

1504, 1510–11 (D. Kan. 1995) (conflicting facts as to motive create question for jury).  The Court

therefore overrules Fricke's motion for summary judgment on this issue.

## II.    First Amendment Retaliation as to Etzel

Plaintiff seeks "[m]onetary relief against Defendant Etzel for failing to hire Plaintiff to fill the

Management Systems Analyst I position, in violation of the First Amendment and 42 U.S.C. § 1983."

Pretrial Order (Doc. #45) at 9.  Etzel seeks summary judgment on plaintiff's claim of retaliatory failure to

rehire, contending that he had no hiring authority for Rentfro's position.[16]  In opposing Etzel's motion for

summary judgment, plaintiff concedes that Etzel had no hiring authority.  The Court therefore sustains

Etzel's motion for summary judgment.

## III.    Qualified Immunity for Fricke and Etzel

Fricke and Etzel assert that they are entitled to qualified immunity.  "Qualified immunity shields

government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983

unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable

person would have known.'"  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 (10th Cir. 1998)

(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Once defendant has raised the qualified

---

[16]    The Pretrial Order contains no claim that Etzel retaliated against plaintiff when he failed to inform Meyers that plaintiff was interested in Rentfro's position.  The pretrial order supercedes all pleadings, establishes the issues for trial and controls the subsequent course of the case.  Fed. R. Civ. P. 16(e); D. Kan. Rule 16.2(d); Miller v. Pfizer, Inc., 196 F. Supp. 2d 1095, 1122 n.92 (D. Kan. 2002); Wilson v. Mukala, 303 F.3d 1207, 1215–16 (10th Cir. 2002).  The Court therefore disregards this theory of liability, which plaintiff first raises in Plaintiff's Memorandum In Opposition To Motion For Summary Judgment (Doc. #51) at 25.  Summary judgment for defendant is proper when plaintiff attempts to assert a claim or theory of recovery not included in the pretrial order.  See Banks v. Armed Forces Bank, 313 F. Supp. 2d 1095, 1103 (D. Kan. 2004) (summary judgment for defendant where plaintiff advanced claim not in pretrial order).

immunity defense, "plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." <u>Mimics, Inc. v. Vill. of Angel Fire</u>, 394 F.3d 836, 841 (10th Cir. 2005); <u>Verdecia v. Adams</u>, 327 F.3d 1171, 1174 (10th Cir. 2003).  The initial inquiry must be whether a constitutional violation occurred; only then may the court consider the "clearly established" element.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If plaintiff fails on either part of the test, the Court must grant qualified immunity.  <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1156 (10th Cir. 2001).

The "clearly established" prong provides fair warning to defendants that their conduct is unconstitutional.  <u>Mimics</u>, 394 F.3d at 842 (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 739–40, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002).  The law is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains."  <u>Roska v. Peterson</u>, 328 F.3d 1230, 1248 (10th Cir. 2003) (internal citation omitted).  The Supreme Court of the United States has defined "clearly established" as follows:

> the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness [is] apparent.

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (internal citation omitted).  Cases with essentially similar factual backgrounds may be particularly powerful support for satisfying the "clearly established" prong. <u>Roska</u>, 328 F.3d at 1248.

### A.       Constitutional or Statutory Violation

Fricke and Etzel argue that because they did not violate plaintiff's constitutional right to free speech,

they are entitled to qualified immunity.  Etzel's argument is well-taken, but for the reasons stated above, Fricke has not conclusively established that he did not violate plaintiff's rights.

### B.     "Clearly Established" Right

Fricke and Etzel assert that plaintiff cannot show a clearly established right because his speech merely disagreed with internal management, budgetary decisions, cost computations and Department discretion.  They point to plaintiff's assertion that he exposed "governmental corruption, impropriety, or other malfeasance," and claim that he has no such evidence.  See Plaintiff's Memorandum In Opposition To Motion For Summary Judgment (Doc. #51), at 24.

At least as of April 1983, a public employee's First Amendment right to speak on a matter of public concern was clearly established.  See supra Part I, I.A; see also Connick, 461 U.S. 138.  It was also clearly established that speech aiming to expose improper operations or questioning the integrity of government officials is of public concern, and thus may properly serve as the basis for a retaliation action against a public employer.  See Conaway, 853 F.2d at 796.  The same was true for speech "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties."  See Patrick v. Miller, 953 F.2d 1240, 1248 (10th Cir. 1992) (quoting Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir. 1988), cert. denied, 488 U.S. 909 (1988)); see also supra Part I.A.

For reasons previously stated, the record reveals that plaintiff's speech touched a matter of public concern.  The law on this subject was well established and, as a matter of law, Fricke is not entitled to qualified immunity.

### IV.     Injunctive Relief Against Goossen

19

Plaintiff claims that he is entitled to injunctive relief that would require Goossen, the present Secretary of Administration, to reinstate his employment in the CMP.  Goossen asserts that because plaintiff seeks injunctive relief against him in his official capacity, plaintiff's claim is essentially against the State and is barred by Eleventh Amendment immunity.  Furthermore, Goossen argues that he was not personally involved in plaintiff's termination or failure to rehire.  Plaintiff contends that reinstatement is prospective equitable relief, which is permissible because the State's immunity covers only suits at law.

The Eleventh Amendment confirms the sovereignty of the States by providing a shield from suits by individuals absent their consent.  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996).  To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits against state officials in their official capacities when plaintiff seeks prospective injunctive relief for a federal violation.  Ex Parte Young, 209 U.S. 123 (1908).  Thus, a federal court may grant equitable relief going forward, including appropriate ancillary measures, but it cannot award retrospective relief such as damages.  Meiners v. Univ. of Kan., 359 F.3d 1222, 1232–33 (10th Cir. 2004).  Reinstatement of employment is a form of prospective equitable relief that is within the doctrine of Ex Parte Young.  Id. (citations omitted).  Thus, a reinstatement action under section 1983 is not barred by Eleventh Amendment immunity.  Id. at 1233.  Furthermore, an official capacity suit essentially represents only an alternative way to plead an action against an entity of which the official is an agent.  Hafer v. Melo, 502 U.S. 21, 25 (1991) (citations omitted).  Official capacity suits are treated as if against the State itself.  Id. (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Thus, when an official dies or leaves office, the official's successor automatically assumes his position in official capacity litigation.  Id.

Plaintiff seeks reinstatement — a recognized form of prospective equitable relief — from Goossen.

20

Plaintiff does not assert any claim for retrospective relief.  Because plaintiff seeks only prospective equitable relief, the Eleventh Amendment does not bar the reinstatement claim.  Goossen's lack of personal involvement in any retaliation is irrelevant because this is an official capacity claim essentially against the State.  Goossen's motion for summary judgment is therefore overruled.[17]

## V.   Plaintiff's Motion for Leave to File Surreply

On July 25, 2005, plaintiff filed Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendants' Motion For Summary Judgment (Doc. #54-1) pursuant to District of Kansas Rules 7.1 and 56.1.  Plaintiff seeks to respond to additional arguments raised by Defendants' Reply To Plaintiff's Response To Defendants' Motion For Summary Judgment (Doc. #53) filed on July 11, 2005. Defendants argue that plaintiff has mistaken for new arguments their responses to his own issues.  See Defendants' Response To Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendants' Motion For Summary Judgment (Doc. #58).

In Doebele v. Sprint/United Management Co., the Tenth Circuit held that Rule 56(c) requires that if the Court relies on "new materials or new arguments" in a reply brief, it may not forbid the nonmovant from responding to those materials.  342 F.3d 1117, 1139 n.13 (10th Cir. 2003) (quoting Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998)).  This rule applies when new legal arguments are raised or new evidentiary materials are introduced.  Id.  In that circumstance, in granting summary

---

[17]      Plaintiff's reinstatement claim is premised upon retaliation by Fricke and Etzel, and not Meyers' failure to rehire him.  The Pretrial Order (Doc. #45) clearly states that plaintiff's claim for reinstatement against Goossen is based on "the elimination of Plaintiff's position as Director of the Central Motor Pool, and/or for the failure to hire [p]laintiff to fill the Management Systems Analyst I position, in violation of the First Amendment and 42 U.S.C. § 1983."  Id. at 9.  Thus, the Court does not consider the arguments concerning Meyers' conduct.

judgment, the Court may either permit a surreply or refrain from considering the new argument or evidentiary material.  Id.

Defendants' motion for summary judgment did not question whether plaintiff's speech touched a matter of public concern.  Defendants first raised that issue in their reply brief.  Plaintiff is therefore entitled to respond to that new argument.  To find otherwise would effectively allow defendants to seek summary judgment on a novel ground without giving plaintiff an opportunity to respond.  The Court therefore sustains plaintiff's motion to file a surreply.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. #46), filed May 13, 2005 be and hereby is SUSTAINED in part.  The Court grants defendants' motion for summary judgment as to plaintiff's claim against Etzel under 42 U.S.C. § 1983.  Defendants' motion is OVERRULED with respect to plaintiff's claims against Fricke and Goossen under 42 U.S.C. § 1983.

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File a Surreply Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. # 54-1) be and hereby is SUSTAINED.

Dated this 13th day of September, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

22